**Electronically Filed
Intermediate Court of Appeals
CAAP-12-0000858
28-MAR-2014
10:49 AM**

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

---oOo---

STATE OF HAWAI'I, Plaintiff-Appellee,
v.
YONG SHIK WON, Defendant-Appellant.

NO. CAAP-12-0000858

APPEAL FROM THE DISTRICT COURT OF THE FIRST CIRCUIT
HONOLULU DIVISION
(CASE NO. 1DTA-11-01903)

March 28, 2014

NAKAMURA, C.J., and FUJISE and GINOZA, JJ.

OPINION OF THE COURT BY NAKAMURA, C.J.

Defendant-Appellant Yong Shik Won (Won) was convicted of operating a vehicle under the influence of an intoxicant (OVUII), in violation of Hawaii Revised Statutes (HRS) § 291E-61(a)(3) (Supp. 2013).[1] A police officer, who observed Won

---

[1] HRS § 291E-61(a)(3) provides:

(a) A person commits the offense of operating a vehicle under the influence of an intoxicant if the person operates or
(continued...)

speeding, pulled Won over and subsequently arrested him for OVUII. At the police station, an officer read the "implied consent" form to Won, and Won agreed to take a breath test, which revealed an alcohol concentration above the legal limit. The police did not provide Won with Miranda warnings[2] before reading the implied consent form and obtaining his agreement to take the breath test.

Prior to trial, Won moved to suppress the results of his breath test. The District Court of the First Circuit (District Court) denied Won's motion to suppress and found him guilty of violating HRS § 291E-61(a)(3).[3]

On appeal, Won argues that the District Court erred in denying his motion to suppress. Prior to 2011, it was settled law that a person arrested for OVUII was not entitled to Miranda warnings or to consult with an attorney before the police asked whether the arrestee would submit to testing. State v. Severino, 56 Haw. 378, 537 P.2d 1187 (1975). Won, however, contends that in light of the Legislature's recent enactment of HRS § 291E-68, which beginning in 2011 made the refusal to submit to a breath, blood, or urine test a crime, the police were required to advise him of his Miranda rights before reading him the implied consent form and obtaining his decision on testing. Won argues that because the police failed to give him Miranda warnings, any statement he made in response to the reading of the implied consent form was inadmissible, and his breath test results should have been suppressed as the fruit of the Miranda violation.

_____

(...continued)
        assumes actual physical control of a vehicle:

            . . .

        (3)  With .08 or more grams of alcohol per two hundred ten
             liters of breath[.]

[2] See Miranda v. Arizona, 384 U.S. 436 (1966).

[3] The Honorable David Lo presided.

In addition, Won argues that the results of his breath test should have been suppressed because the police violated his statutory right to an attorney under HRS § 803-9 (1993);[4] misinformed him of his statutory right to an attorney, and misinformed him of the sanctions for refusing to submit to testing under the provisions of the current statutory scheme. Won further argues that in light of the United States Supreme Court's recent decision in Missouri v. McNeely, 133 S. Ct. 1552 (2013), HRS § 291E-68 is unconstitutional; that because HRS § 291E-68 is unconstitutional, he was misinformed of the sanctions for refusing to submit to testing since the implied consent form referred to sanctions under HRS § 291E-68; and that based on McNeely, the police were required to obtain a search warrant before conducting his breath test.

For the reasons set forth below, we hold that Won was not subjected to interrogation for purposes of Miranda and that the police did not violate Won's Miranda rights in obtaining his decision on testing; that Won has not met his burden of showing that McNeely rendered HRS § 291E-68 unconstitutional; that Won does not prevail on his other arguments; and that the District Court did not err in denying Won's motion to suppress. Accordingly, we affirm Won's conviction.

---

[4] HRS § 803-9, entitled "Examination after arrest; rights of arrested person[,]" provides in relevant part:

It shall be unlawful in any case of arrest for examination:

(1) To deny to the person so arrested the right of seeing, at reasonable intervals and for a reasonable time at the place of the person's detention, counsel or a member of the arrested person's family;

. . .

(4) In case the person arrested has requested that the person see an attorney or member of the person's family, to examine the person before the person has had a fair opportunity to see and consult with the attorney or member of the person's family[.]

3

BACKGROUND

The following facts are based on police reports and related exhibits, which the parties stipulated into evidence. On April 20, 2011, at about 3:15 a.m., Honolulu Police Department (HPD) Officer Vincent Gonzales (Officer Gonzales) observed Won traveling faster than the posted speed limit. Officer Gonzales paced Won going at about 55 miles per hour (mph) in a 35 mph zone and subsequently stopped Won's vehicle.

While speaking with Won, Officer Gonzales observed that Won had "red, watery, eyes[,]" and that he "emitted a strong odor of an alcoholic type beverage[.]" Officer Gonzales told Won that he "believed [Won] to be intoxicated" and asked Won to perform the Standardized Field Sobriety Tests (SFSTs), which Won agreed to perform. Won performed poorly on the SFSTs. Won agreed to take a Preliminary Alcohol Screening (PAS) test, which revealed a breath alcohol content of 0.176.[5/]

Based on these observations, HPD Sergeant Albert Lee arrested Won and Officer Gonzales transported Won to the police station. At the police station, Sergeant Lee presented Won with a copy of a form entitled, "Use of Intoxicants While Operating a Vehicle Implied Consent for Testing" (Implied Consent Form), and read the form to him. Specifically, the Implied Consent Form provided:

> Pursuant to chapter 291E, Hawaii Revised Statutes (HRS), Use of Intoxicants While Operating a Vehicle, you are being informed of the following:
>
> 1. Any person who operates a vehicle upon a public way, street, road, or highway or on or in the waters of the State shall be deemed to have given consent to a test or tests for the purpose of determining alcohol concentration or drug content of the persons [sic] breath, blood, or urine as applicable.
>
> 2. You are not entitled to an attorney before you submit to any test or tests to determine your alcohol and/or drug content.

---

[5/] Pursuant to HRS § 291E-11 (2007), the results of a PAS test shall only be used in determining probable cause for an arrest, and Won's PAS test results are not at issue in this case.

4

3. You may refuse to submit to a breath or blood test, or both for the purpose of determining alcohol concentration and/or blood or urine test, or both for determining drug content, none shall be given, except as provided in section 291E-21. However, if you refuse to submit to a breath, blood, or urine test, you shall be subject to up to thirty days imprisonment and/or fine up to $1,000 or the sanctions of 291E-65, if applicable. In addition, you shall also be subject to the procedures and sanctions under chapter 291E, part III.

(Emphasis added; formatting altered.)

Won initialed the first and third enumerated paragraphs of the Implied Consent Form, but did not initial the second paragraph, stating that he "[did] not agree" with it and was "not going to initial" it. Won initialed the portion of the form that stated that he "[a]greed to take a breath test and refused the blood test[,]" and he signed and dated the form. Won's breath test showed a breath alcohol concentration of 0.170 grams of alcohol per 210 liters of breath.

Plaintiff-Appellee State of Hawai'i (State) charged Won by complaint with OVUII, in violation of HRS § 291E-61(a)(1) and (a)(3).[6/] The District Court granted Won's motion to dismiss the HRS § 291E-61(a)(1) portion of the charge, and therefore the State only proceeded to trial on the alleged HRS § 291E-61(a)(3) violation. Prior to trial, Won filed a suppression motion to preclude the State from introducing evidence of the results of his breath test. Won argued that the results of his breath test should be suppressed because: (1) he was mislead and/or inadequately advised as to his rights surrounding the breath test; (2) his Miranda rights were violated; (3) his statutory right to consult with an attorney pursuant to HRS § 803-9 was violated; and (4) his consent to take the breath test was coerced.

The parties agreed that Won's suppression motion and trial would be decided on stipulated evidence, which included Won's police reports and related exhibits. The District Court

_____

[6/] The State also alleged that Won was subject to sentencing as a first offender in accordance with HRS § 291E-61(b)(1) (Supp. 2013).

denied Won's motion to suppress and found Won guilty of OVUII in violation of HRS § 291E-61(a)(3).[1] The District Court sentenced Won to a fine of $500, a one-year revocation of his driver's license, 14 hours of substance abuse rehabilitation as well as substance abuse assessment and possible treatment, and various fees and assessments. The District Court entered its Judgment on October 25, 2012.

After Won had filed his opening brief, the United States Supreme Court issued McNeely, a decision relating to non-consensual blood draws in OVUII cases. In light of McNeely, Won filed a motion for supplemental briefing. The State did not oppose Won's motion, which this court granted. Won and the State submitted supplemental briefs on the effect of McNeely on the instant case, and the Attorney General filed an amicus brief defending the constitutionality of Hawaii's implied consent law, set forth in HRS Chapter 291E. Oral argument was held on September 26, 2013.

DISCUSSION

I.

A.

"No one can seriously dispute the magnitude of the drunken driving problem or the States' interest in eradicating it." Michigan Dept. of State Police v. Sitz, 496 U.S. 444, 451 (1990). In 2012, 10,322 people were killed nationwide in alcohol-impaired driving crashes. See National Highway Traffic Safety Administration (NHTSA), Traffic Safety Facts, 2012 Motor Vehicle Crashes: Overview (No. 811856, Nov. 2013), http://www-nrd.nhtsa.dot.gov/Pubs/811856.pdf. In Hawai'i, there were 51 drunk driving fatalities in 2012, representing 41 percent of all traffic deaths for that year. Id.

---

[1] The Judgment indicates that Won violated "HRS [§] 291E-61(a)(1)(3)(b)(1)." However, as noted supra, the record shows that the (a)(1) portion of the charge was dismissed, and the State proceeded only on the (a)(3) portion of the charge.

"[A]ll 50 States have adopted implied consent laws that require motorists, as a condition of operating a motor vehicle within the State, to consent to BAC [(blood alcohol concentration)] testing if they are arrested or otherwise detained on suspicion of a drunk-driving offense." McNeely, 133 S. Ct. at 1566. The Hawai'i Legislature enacted our implied consent statute in 1967 to reduce deaths, injuries, and damages arising out of highway traffic accidents. See 1967 Haw. Sess. Laws Act 214, at § 1. In declaring its purpose in 1967 for enacting the implied consent statute, the Legislature stated:

> Deaths of persons and injuries to them and damages to property with the other losses suffered on account of highway traffic accidents are of grave concern to the State and its citizens as well as to the federal government. The legislature finds and declares that it is in the public interest that the State initiate, coordinate and accelerate every available means to decrease the fatalities, injuries, damages and losses resulting from highway traffic accidents.

Id.

The implied consent and testing provisions of Hawai'i's statutory scheme are currently set forth in HRS Chapter 291E, Part II. Under Hawai'i's statutory scheme, a person who drives on a public road is deemed to have consented to undergo chemical testing for alcohol or drugs, as prescribed by HRS Chapter 291E, Part II. HRS § 291E-11 (2007), provides in relevant part:

> (a) Any person who operates a vehicle upon a public way, street, road, or highway or on or in the waters of the State shall be deemed to have given consent, subject to this part, to a test or tests approved by the director of health of the person's breath, blood, or urine for the purpose of determining alcohol concentration or drug content of the person's breath, blood, or urine, as applicable.
>
> (b) The test or tests shall be administered at the request of a law enforcement officer having probable cause to believe the person operating a vehicle upon a public way, street, road, or highway or on or in the waters of the State is under the influence of an intoxicant or is under the age of twenty-one and has consumed a measurable amount of alcohol, only after:
>
> (1) A lawful arrest; and
>
> (2) The person has been informed by a law enforcement officer that the person may refuse to submit to testing under this chapter.

7

> (c) If there is probable cause to believe that a person is in violation of . . . section 291E-61 or 291E-61.5, [8/] as a result of having consumed alcohol, then the person shall elect to take a breath or blood test, or both, for the purpose of determining the alcohol concentration.

(Emphasis added.)

If a person under arrest for OVUII refuses to submit to breath, blood, or urine testing, "none shall be given," HRS § 291E-15 (Supp. 2013),9/ except that in the event there is a collision resulting in injury or death, a law enforcement officer is not required to accept the person's refusal to undergo testing. Id.; HRS § 291E-21 (2007).10/

Prior to 2011, if a person failed to honor his or her implied consent and refused to submit to chemical sobriety testing as prescribed by HRS Chapter 291E, the person was subject to administrative sanctions in the form of revocation of his or her driver's license and referral for substance abuse assessment

---

8/ HRS § 291E-61 sets forth the criminal offense of OVUII and HRS § 291E-61.5 sets forth the criminal offense of Habitual OVUII.

9/ HRS § 291E-15 provides:

> If a person under arrest refuses to submit to a breath, blood, or urine test, none shall be given, except as provided in section 291E-21. Upon the law enforcement officer's determination that the person under arrest has refused to submit to a breath, blood, or urine test, if applicable, then a law enforcement officer shall:

> (1)  Inform the person under arrest of the sanctions under section 291E-41, 291E-65, or 291E-68; and

> (2)  Ask the person if the person still refuses to submit to a breath, blood, or urine test, thereby subjecting the person to the procedures and sanctions under part III or section 291E-65, as applicable;

> provided that if the law enforcement officer fails to comply with paragraphs (1) and (2), the person shall not be subject to the refusal sanctions under part III or IV.

10/ HRS § 291E-21 provides in relevant part:

> (a) Nothing in this part shall be construed to prevent a law enforcement officer from obtaining a sample of breath, blood, or urine, from the operator of any vehicle involved in a collision resulting in injury to or the death of any person, as evidence that the operator was under the influence of an intoxicant.

and treatment. See HRS §§ 291E-41 (2007), 291E-65 (2007). The administrative sanctions remain in effect. However, effective January 1, 2011, the Legislature enacted HRS § 291E-68, which imposed additional criminal sanctions for the refusal to submit to a breath, blood, or urine test. See 2010 Haw. Sess. Laws Act 166, §§ 2, 26, at 398, 415. In its current form, HRS § 291E-68 (Supp. 2013) provides: "Except as provided in section 291E-65,[11/] refusal to submit to a breath, blood, or urine test as required by part II is a petty misdemeanor." Under the Hawaiʻi Penal Code, a person convicted of a petty misdemeanor may be sentenced to imprisonment for a term not to exceed thirty days, and may be sentenced to pay a fine not exceeding $1,000. See HRS §§ 706-663 (1993), 706-640 (Supp. 2013).

Accordingly, under the statutory scheme, except for cases involving collisions resulting in death or injury, the Hawaiʻi Legislature has chosen to avoid violent police-citizen confrontations as a means of securing chemical sobriety test results. Instead of authorizing the police to force persons arrested in the typical OVUII case to undergo chemical testing based on their implied consent, the Hawaiʻi Legislature has chosen to use the threat of administrative and criminal sanctions to encourage arrestees to submit to testing.[12/] "[T]he effect of implied consent legislation 'is to equip [law enforcement] officers with an instrument of enforcement not involving physical

---

[11/] HRS § 291E-65 (Supp. 2013) pertains to sanctions for persons under the age of twenty-one who are arrested for operating a vehicle after consuming a measurable amount of alcohol and who refuse to submit to testing.

[12/] Won's case is a "typical" OVUII case in that: (1) he was arrested on probable cause to believe that he was OVUII, in violation of HRS § 291E-61, as a result of having consumed alcohol; (2) Won was not "operating a vehicle involved in a collision resulting in injury to or death of any person," see HRS § 291E-21; and (3) Won was not arrested for operating a vehicle with a measurable amount of alcohol while under the age of twenty-one, in violation of HRS § 291E-64 (2007). Our analysis in this case is limited to the provisions of HRS Chapter 291E which apply to a "typical" OVUII case like Won's case. We do not address or analyze other provisions of HRS Chapter 291E, such as those applicable to cases involving the operation of a vehicle involved in a collision resulting in death or injury or the operation of a vehicle by a person under twenty-one with a measurable amount of alcohol.

compulsion.'"  Rossell v. City and County of Honolulu, 59 Haw. 173, 182, 579 P.2d 663, 669 (1978) (citation omitted).  The Legislature's "obvious reason" for permitting persons, deemed to have given consent as a matter of law, to refuse testing "is to avoid the violence which would often attend forcible tests upon recalcitrant inebriates."  Id.

B.

Won argues that in light of the recent enactment of HRS § 291E-68, which makes refusing to submit to a breath, blood, or urine test a crime, the police were required to give him Miranda warnings before reading the Implied Consent Form to him and obtaining his decision regarding testing.  Won contends that because the police failed to advise him of his Miranda rights, any statement he made in response to the Implied Consent Form was inadmissible and the results of his breath test should have been suppressed as the "Fruit of the Poisonous Tree."  We disagree.

At least fourteen other states, like Hawaiʻi, have enacted implied consent laws that impose criminal sanctions on a driver for refusing to submit to chemical testing, either as a separate offense or as an element authorizing the imposition of an increased sentence for a driver found to have operated a vehicle under the influence of an intoxicant.[13]  It appears that all the courts from other jurisdictions that have considered implied consent laws imposing such criminal sanctions in the

---

[13] These states are: Alaska, California, Florida, Iowa, Kansas, Louisiana, Maine, Minnesota, Nebraska, Ohio, Pennsylvania, Rhode Island, Vermont, and Virginia.  See Alaska Stat. Ann. §§ 28.35.031, 28.35.032 (West, Westlaw through 2013 Sess.); Cal Veh. Code §§ 23538, 23577 (West, Westlaw through Ch. 4 of 2014 Sess.); Fla. Stat. Ann. §§ 316.1932, 316.1939 (West, Westlaw through 2013 Sess.); Iowa Code Ann. § 321J.2(3)(b)(2)(d) (West, Westlaw through 2013 Sess.); Kansas Stat. Ann. § 8-1025 (West, Westlaw through 2013 Reg. & Special Sess.); La. Stat. Ann. §§ 14:98.2, 32:666 (West, Westlaw through 2013 Sess.); Me. Rev. Stat. tit. 29-A, § 2411(5)(A)(3)(b) (West, Westlaw through 2013 Sess.); Minn. Stat. Ann. §§ 169A.20, 169A.26(1)(b) (West, Westlaw through Ch. 147 of 2014 Sess.); Neb. Rev. Stat. Ann. §§ 60-6,197, 60-6,197.03 (West, Westlaw through 2013 Sess.); Ohio Rev. Code Ann. § 4511.19(A)(2), (G)(1)(a)(ii) (West, Westlaw through 2013 Sess.); 75 Pa. Cons. Stat. Ann. § 3804(c) (West, Westlaw through Reg. Sess. Act 2014-5); R.I. Gen. Laws Ann. § 31-27-2.1 (West, Westlaw through Ch. 534 of 2013 Sess.); Vt. Stat. Ann. tit. 23, §§ 1201, 1202 (West, Westlaw through 2013 portion of 2013-2014 Legis. Sess.); Va. Code Ann. § 18.2-268.3 (West, Westlaw through 2013 Sess.).

context of challenges, like that raised by Won, alleging Miranda violations or violations of the protection against self-incrimination, have rejected those challenges. These courts have held that a driver's refusal to submit to testing is not a "testimonial communication" and that the conduct of the police in determining whether the driver refuses to submit to testing does not constitute "interrogation" for Miranda purposes. Accordingly, they have held the actions of the police in determining whether the driver refuses to submit to testing does not implicate the driver's Miranda rights or the protection against self-incrimination.

As explained below, we join what appears to be the uniform view of every other court that has considered the issue raised by Won, under laws similar to Hawai'i's that impose criminal sanctions on a driver's refusal to submit to testing, and hold that the conduct of the police in this case did not violate Won's Miranda rights.[14] The police were not required to give Miranda warnings to Won before reading the Implied Consent Form to him or obtaining his decision regarding testing. Accordingly, the results of Won's breath test was not subject to suppression as the fruit of a Miranda violation.

C.

1.

The requirements imposed by Miranda v. Arizona, 384 U.S. 436 (1966), were designed to safeguard a defendant's privilege against compulsory self-incrimination. See Rhode Island v. Innis, 446 U.S. 291, 297 (1980). In Miranda, "the Court concluded that in the context of 'custodial interrogation' certain procedural safeguards are necessary to protect a defendant's Fifth and Fourteenth Amendment privilege against

---

[14] We note that in his briefs on appeal, Won has not cited any case construing laws similar to Hawai'i's that impose criminal sanctions on a driver's refusal to submit to testing, in which the court held that the driver was entitled to Miranda warnings before the police could determine whether he or she would submit to testing.

compulsory self-incrimination." <u>Innis</u>, 446 U.S. at 297.[15] "The concern of the Court in <u>Miranda</u> was that the 'interrogation environment' created by the interplay of interrogation and custody would 'subjugate the individual to the will of his examiner' and thereby undermine the privilege against compulsory self-incrimination." <u>Id.</u> at 299 (citation omitted).

In <u>State v. Santiago</u>, 53 Haw. 254, 492 P.2d 657 (1971), the Hawai'i Supreme Court held that "the protections which the United States Supreme Court enumerated in <u>Miranda</u> have an independent source in the Hawai'i Constitution's privilege against self-incrimination[,]" which is now set forth in Article I, Section 10 of the Hawai'i Constitution.[16] <u>Santiago</u>, 53 Haw. at 266, 492 P.2d at 664; <u>State v. Ketchum</u>, 97 Hawai'i 107, 116 & n.14, 34 P.3d 1006, 1015 & n.14 (2001).

> Thus, as a matter of state constitutional law, article I, section 10
>
>> requires that before reference is made at trial to statements made by the accused during custodial interrogation, the prosecutor must first demonstrate that certain safeguards were taken before the accused was questioned. . . . [T]he prosecutor must show that each accused was warned that he [or she] had a right to remain silent, that anything said could be used against him [or her], that he [or she] had a right to the presence of an attorney, and that if he [or she] could no[t] afford an attorney one would be appointed for him [or her]. . . . [U]nless these protective measures are taken, statements made by the accused may not be used either as direct evidence in the prosecutor's case in chief or to impeach the defendant's credibility during rebuttal or cross-examination.

<u>Ketchum</u>, 97 Hawai'i at 116, 34 P.3d at 1015 (footnote omitted;

---

[15] The Fifth Amendment to the United States Constitution provides in relevant part: "No person . . . shall be compelled in any Criminal Case to be a witness against himself. . . ." U.S. Const. amend V. The Fifth Amendment privilege against self-incrimination was made applicable to the states pursuant to the Fourteenth Amendment. <u>See Malloy v. Hogan</u>, 378 U.S. 1, 5 (1964).

[16] Specifically, Article I, Section 10 of the Hawai'i Constitution provides in relevant part: "nor shall any person be compelled in any criminal case to be a witness against oneself." Haw. Const. art. I, § 10. When <u>Santiago</u> was decided, this identical language of Article I, Section 10 was contained in Article I, Section 8 of the Hawai'i Constitution, except the term "himself" was used instead of "oneself." <u>See State v. Ketchum</u>, 97 Hawai'i 107, 116 & n.14, 34 P.3d 1006, 1015 & n.14 (2001).

brackets and ellipsis points in original) (quoting Santiago, 53 Haw. at 266, 492 P.2d at 664).

2.

Miranda warnings are required when two conditions are met: (1) the defendant must be in custody; and (2) the defendant must be under interrogation. Id. at 118-19, 34 P.3d at 1017-18. There is no dispute that for Miranda purposes, Won was in custody when the police presented him with the Implied Consent Form. Thus, the critical question in this case is whether Won was "under interrogation" when the Implied Consent Form was read to him.

In Innis, the Supreme Court explained that not all statements obtained by the police after a suspect has been taken into custody are "to be considered the product of interrogation." Innis, 446 U.S. at 299. Rather "the special procedural safeguards outlined in Miranda" only apply where a suspect is both taken into custody and "is subjected to interrogation." Id. at 300. The Court explained that "'[i]nterrogation,' as conceptualized in the Miranda opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself." Id.

In Innis, the Court held that "the term 'interrogation' under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Id. at 301 (footnote omitted). Subsequently, the Court clarified that it did not create an automatic booking exception to Miranda for "any question asked during the booking process[.]" Pennsylvania v. Muniz, 496 U.S. 582, 602 n.14 (1990) (internal quotation marks and citation omitted). The Court explained that "[w]ithout obtaining a waiver of the suspect's Miranda rights, the police may not ask questions, even during booking, that are designed to elicit incriminatory admissions." Id. (internal quotation marks and citation omitted).

In Ketchum, the Hawai'i Supreme Court stated that in general, "interrogation" for Miranda purposes means "express questioning or its functional equivalent[,]" and whether the police have "subjected a person to 'interrogation' is determined by objectively assessing the 'totality of the circumstances.'" Ketchum, 97 Hawai'i at 119, 34 P.3d at 1018 (some internal quotation marks and citations omitted). "[T]he ultimate question becomes 'whether the police officer should have known that his or her words or actions were reasonably likely to elicit an incriminating response' from the person in custody." Id. (brackets and citation omitted). In determining whether "interrogation" has occurred under the totality of the circumstances, a court must "focus upon the officer's conduct, the nature of the question (including whether the question is a 'routine booking question'), and any other relevant circumstance." Id. at 121, 34 P.3d at 1020 (footnote omitted).

3.

In addition, both the United States Supreme Court and the Hawai'i Supreme Court have drawn a distinction between a suspect being compelled to provide testimonial communications and being compelled to become the source of real or physical evidence. The protections of Miranda and the privilege against self-incrimination only apply to testimonial communications. See Muniz, 496 U.S. at 590-92, (stating that the privilege against self-incrimination does not protect a suspect from being compelled to produce real or physical evidence, but only from being compelled to provide the government with evidence of a testimonial or communicative nature, and that Miranda protections applied to verbal statements "that were both testimonial in nature and elicited during custodial interrogation"); State v. Wyatt, 67 Haw. 293, 302-03, 687 P.2d 544, 551 (1984) (concluding that the police conduct of a field sobriety test did not implicate the privilege against self-incrimination because the State did not seek "communications" or "testimony" from the defendant); State v. Bowers, 548 N.W.2d 725, 731 (Neb. 1996)

("Miranda implicates only statements that are both testimonial in nature and elicited during custodial interrogation."). To be protected by Miranda, the "incriminating response" by a suspect in custody "must be testimonial in nature." Ketchum, 97 Hawai'i at 130, 34 P.3d at 1029 (Acoba, J., concurring and dissenting); see Muniz, 496 U.S. at 590, 600; United States v. Rodriguez-Garcia, 983 F.2d 1563, 1568 (10th Cir. 1993) ("Consenting to a search is not 'evidence of a testimonial or communicative nature' which would require officers to first present a Miranda warning."). In order to be testimonial, the suspect's communication must itself "relate to a factual assertion or disclose information." Muniz, 496 U.S. at 589 (internal quotation marks and citation omitted); Ketchum, 97 Hawai'i at 130, 34 P.3d at 1029 (Acoba, J., concurring and dissenting).

D.

We first address Schmerber v. California, 384 U.S. 757 (1966), and South Dakota v. Neville, 459 U.S. 553 (1983), United States Supreme Court decisions which examined the implications of Miranda and the Fifth Amendment in the context of a compelled blood draw of a defendant suspected of OVUII[17/] and an implied consent statute authorizing the use of evidence of the defendant's refusal to undergo testing in an OVUII prosecution. We next discuss the Hawai'i Supreme Court's decision in Severino, which held that an OVUII arrestee was not entitled to Miranda warnings or to consult with an attorney before the police determined whether he would submit to testing, under Hawai'i's then-existing implied consent statute. We then consider cases from other jurisdictions that have considered Miranda and self-incrimination claims in the context of implied consent statutes, which, like Hawai'i's current statute, impose criminal sanctions for refusal to submit to chemical testing.

---

[17/] When referring to cases or statutes from other jurisdictions, we will use OVUII to generically refer to offenses prohibiting the operation of a vehicle while impaired by, or with specific levels of, alcohol or drugs.

1.

In Schmerber, the police arrested Schmerber for OVUII and directed a doctor to withdraw a blood sample for alcohol testing, despite Schmerber's refusal to consent to the test. Schmerber, 384 U.S. at 758-59. The results of this blood-alcohol test were admitted at trial and used to convict Schmerber of OVUII. Id. at 759. Schmerber appealed on several grounds, including that the withdrawal of his blood and the admission in evidence of the blood-test analysis violated his Fifth Amendment privilege against self-incrimination. Id. at 759-61.

In addressing Schmerber's argument, the Court stated that the critical question was whether Schmerber was "compelled to be a witness against himself." Id. at 761 (internal quotation marks omitted). The Court rejected Schmerber's claim that the blood-test evidence should have been suppressed because it was obtained in violation of his Fifth Amendment privilege against self-incrimination. The Court held that:

> the privilege protects an accused only from being compelled to testify against himself, or otherwise provide the State with evidence of a testimonial or communicative nature, and that the withdrawal of blood and use of the analysis in question in this case did not involve compulsion to these ends.

Id. (footnote omitted; emphasis added).

The Court noted that courts have typically held that the Fifth Amendment "offers no protection against compulsion to submit to fingerprinting, photographing, or measurements, to write or speak for identification, to appear in court, to stand, to assume a stance, to walk, or to make a particular gesture." Id. at 764. The Court explained that the distinction which has emerged "is that the privilege is a bar against compelling 'communications' or 'testimony,' but that compulsion which makes a suspect or accused the source of 'real or physical evidence' does not violate it." Id. The Court concluded that although the blood-test evidence was "an incriminating product of compulsion," it was not testimonial or communicative in nature, and it

16

therefore "was not inadmissible on privilege grounds." Id. at 765.

2.

In Neville, the Court considered whether the admission in evidence of Neville's refusal to take a blood-alcohol test, pursuant to South Dakota's implied consent statute that authorized the use of such refusal evidence in a criminal OVUII trial, would violate Neville's privilege against self-incrimination. Neville, 459 U.S. at 554-58. The Court held that the admission of the refusal evidence would not violate Neville's privilege against self-incrimination. Id. at 554. It also concluded that the police inquiry into whether a suspect will take a blood-alcohol test, pursuant to an implied consent statute, does not constitute interrogation within the meaning of Miranda. Id. at 564 n.15.

The Court noted that Schmerber held that since a blood test was "'physical or real' evidence rather than testimonial evidence," it was unprotected by the Fifth Amendment. Id. at 559.¹⁸/ Therefore, the Court reasoned that Schmerber "clearly allows a State to force a person suspected of driving while intoxicated to submit to a blood alcohol test." Id. The Court explained, however, that "to avoid violent confrontations," South Dakota "has declined to authorize its police officers to administer a blood-alcohol test against the suspect's will." Id. Instead, the South Dakota statute permits a suspect to refuse the test and requires the police to inform the suspect of his right to refuse. Id. at 559-60. The Court, however, stated that "[t]his permission is not without a price," as the South Dakota law authorizes the imposition of the sanction of license revocation for one year for a person who refuses to take the test. Id. at 560. In addition, "South Dakota further

---

¹⁸/ The Court also noted that Schmerber had also rejected arguments that the coerced blood test violated the rights to due process and counsel, and the prohibition against unreasonable searches and seizures. Id. at 559 n.8.

discourages the choice of refusal by allowing the refusal to be used against the defendant at [a criminal OVUII] trial." Id.

The Court held that the sanctions for refusal imposed by the South Dakota statutory scheme did not violate the Fifth Amendment. The Court explained that South Dakota "did not directly compel [Neville] to refuse the test, for it gave him the choice of submitting to the test or refusing[,]" id. at 562, and that "the values behind the Fifth Amendment are not hindered when the state offers a suspect the choice of submitting to the blood-alcohol test or having his refusal used against him." Id. at 563. It stated that "[t]he simple blood-alcohol test is so safe, painless, and commonplace . . . that the state could legitimately compel the suspect, against his will, to accede to the test." Id. The Court concluded that since

> the offer of taking a blood-alcohol test is clearly legitimate, the action becomes no less legitimate when the State offers a second option of refusing the test, with the attendant penalties for making that choice. Nor is this a case where the State has subtly coerced respondent into choosing the option it had no right to compel, rather than offering a true choice. To the contrary, the State wants respondent to choose to take the test, for the inference of intoxication arising from a positive blood-alcohol test is far stronger than that arising from a refusal to take the test.

Id. at 563-64 (some emphasis added).

The Court recognized that the choice to submit to or refuse a blood-alcohol test is not an easy or pleasant one for a suspect, but it stated that "the criminal process often requires suspects and defendants to make difficult choices." Id. at 564. The Court held that the refusal to take a blood-alcohol test lawfully requested by a police officer, "is not an act coerced by the officer, and thus not protected by the privilege against self-incrimination." Id.

The Court also addressed the Miranda implications of a police officer's asking a suspect whether he or she will take a blood-alcohol test pursuant to an implied consent statutory scheme. The Court concluded:

18

> In the context of an arrest for driving while intoxicated, a police inquiry of whether the suspect will take a blood-alcohol test is not an interrogation within the meaning of Miranda. As we stated in Rhode Island v. Innis, 446 U.S. 291, 301, 100 S. Ct. 1682, 1689, 64 L. Ed.2d 297 (1980), police words or actions "normally attendant to arrest and custody" do not constitute interrogation. The police inquiry here is highly regulated by state law, and is presented in virtually the same words to all suspects. It is similar to a police request to submit to fingerprinting or photography. [Neville's] choice of refusal thus enjoys no prophylactic Miranda protection outside the basic Fifth Amendment protection.

Id. at 564 n.15 (emphases added).

3.

In Severino, the Hawai'i Supreme Court held that an OVUII arrestee was not entitled to Miranda warnings or to consult with counsel before the police asked whether the arrestee would submit to chemical testing under the 1974 version of Hawaii's implied consent law. Severino, 56 Haw. at 380-81, 537 P.2d at 1189. The court concluded that because actions taken under the implied consent law are civil in nature, "a motorist is not entitled to consult with counsel before deciding to submit to the chemical test prescribed by the implied consent statute." Id. The court further held that an OVUII arrestee is not

> entitled to the Miranda warnings prior to being required to submit to the chemical tests prescribed by statute, inasmuch as the Miranda rights are not applicable to implied consent proceedings. He is deemed by law to have given his prior consent.

Id. at 381, 537 P.2d at 1189 (internal citation omitted).

Severino had been arrested for OVUII and was advised of his Miranda rights and the requirements and sanctions of the implied consent law. Id. at 380, 537 P.2d at 1188. Severino refused to answer questions and refused to take any chemical tests for alcohol until he spoke to a lawyer. Id. His driver's license was revoked based on his refusal to submit to testing. Id. at 379, 537 P.2d at 1188. The court held that although the police were not required to provide Severino with Miranda warnings before determining whether he would submit to testing, because the police had given him Miranda warnings, they were

19

required to make clear that the Miranda rights did not apply to Servino's decision on whether to submit to chemical testing. Id. at 381-82, 537 P.2d at 1189-90. However, the police did not make clear to Severino that his Miranda rights did not apply to this decision. Id. at 382, 537 P.2d at 1190. The court reversed the revocation of Severino's license, concluding that he had been misled by the Miranda warnings into believing that he had a right to remain silent and to refuse to submit to the test until he had consulted with his lawyer. Id.

4.

Won contends that the Hawai'i Supreme Court's holding in Severino that an OVUII arrestee is not entitled to Miranda warnings or to consult with counsel before the police determine whether the arrestee will submit to chemical testing is no longer good law. He contends that the Legislature's recent enactment of HRS § 291E-68 to impose criminal penalties for refusing to submit to testing changes the analysis, and that the police must now give an OVUII suspect Miranda warnings before reading the Implied Consent Form or obtaining the arrestee's decision regarding testing.

We disagree. Won's argument appears to have been uniformly rejected by every court that has construed implied consent statutes which like Hawai'i's statute impose criminal sanctions for refusal to submit to testing.

In Deering v. Brown, 839 F.2d 539 (9th Cir. 1988), the United States Court of Appeals for the Ninth Circuit considered Alaska's implied consent statute, which like Hawai'i's statute made the refusal to submit to testing a crime. Deering was prosecuted for OVUII and refusal to submit to breathalyzer testing, both full misdemeanors punishable by up to a year in prison, and his refusal to submit to testing was used as evidence supporting both charges. Id. at 541. The Ninth Circuit held that, regardless of criminalization, Deering's refusal to submit to testing was not a testimonial communication, it was not compelled, and as a nontestimonial communication, it was not

20

subject to <u>Miranda</u> protection.  <u>Id.</u> at 542-44.  The court
therefore held that use of evidence of Deering's refusal at trial
did not violate Deering's rights under the Fifth Amendment or
<u>Miranda</u>.  <u>Id.</u> at 544.

In holding that Deering's refusal was not a testimonial
communication, the court started its discussion by noting that in
the context of the OVUII charge, Deering's refusal to take the
test was clearly nontestimonial conduct indicating a
consciousness of guilt.  <u>Id.</u> at 541.  However, like Won, Deering
argued that criminalizing the refusal to submit to testing
changed the analysis and transformed the refusal into a
"'testimonial' statement."  <u>Id.</u>  The Ninth Circuit rejected this
argument.  The court held that making refusal "an element of [a]
crime, rather than merely *evidence* of an element of the crime (as
it is in the case of the [OVUII] charge), does not transform the
nature of the refusal itself."  <u>Id.</u> at 542.

The court explained that "Alaska's [criminal] refusal
statute [was] closely analogous to a criminal contempt penalty
for violating a court order to produce nontestimonial evidence."
<u>Id.</u>  The court concluded:

> Just as a defendant facing a court order to produce
> nontestimonial evidence[, such as a handwriting exemplar,]
> has no constitutional right to refuse the order, so Deering
> had no right to refuse the police request for a breathalyzer
> test.  And just as the imposition of *criminal* contempt
> penalties does not transform the refusal to obey a court
> order regarding nontestimonial evidence into a testimonial
> communication with respect to the contempt charge, neither
> does the imposition by the State of Alaska of a criminal
> penalty for refusal to provide the state with the physical
> evidence of a breathalyzer test -- beyond the civil penalty
> of license revocation clearly condoned in <u>Neville</u> --
> qualitatively transform the refusal into testimony.

<u>Id.</u> at 542 (internal citations omitted).  Like evidence of the
failure to obey a court order that is used to prove a criminal
contempt charge, "evidence of Deering's refusal was not used for
the testimonial or communicative content conveyed by his act of
refusal[,]" but instead was "used to show that he had not
performed the physical act of actually taking the test when

21

requested." Id. Because Deering's act of refusal was not used for its communicative content but simply to convey that he failed to take the test when requested, the court concluded that the act of refusal was not testimonial. Id. [19]

The Ninth Circuit also addressed Deering's argument that evidence of his refusal to take the breathalyzer test was obtained by the police in violation of his Miranda rights. The court rejected Deering's Miranda claim. Id. at 544. The court held that the "protections of Miranda do not apply to nontestimonial evidence" and that Deering's refusal to take the test was nontestimonial. Id.

In addition to Deering, it appears that every other court that has considered Miranda or Fifth Amendment claims in the context of implied consent statutes with criminal refusal provisions similar to Hawai'i's have rejected the claims. These courts have held that police inquiry into whether an OVUII suspect will submit to testing pursuant to such implied consent statutes does not constitute interrogation for Miranda purposes and that the refusal to submit to testing is not a testimonial communication. E.g., State v. Morale, 811 A.2d 185, 189-90 (Vt. 2002) (holding that the police asking an OVUII suspect, "Do you wish to take the breath test?" did not constitute interrogation protected by Miranda); Rowley v. Commonwealth, 629 S.E.2d 188, 190-91 (Va. Ct. App. 2006) ("[T]he 'fact of the refusal to perform tests that do not themselves constitute communicative or testimonial evidence is equally non-communicative and non-testimonial in nature[,]'" (citation omitted), and the refusal to

_____

[19] The court also held that Deering's refusal was not "compelled" for purposes of the Fifth Amendment by making the refusal to submit to testing a crime. Id. at 542-44. The court explained that the choice presented to Deering of either producing the breathalyzer evidence or facing criminal sanctions for withholding it, was "no more impermissibly coercive than any order to produce physical evidence which is backed by the sanction of criminal contempt." Id. at 543. In addition, the court noted that the state does not directly compel a refusal. Id. "[T]he compulsion [that criminalizing refusal] increases is the compulsion to *submit* to the breathalyzer test, not the compulsion to *refuse*, and *refusal* is the conduct made criminal in the statute." Id.

submit to testing, "[a]n inherently nontestimonial act[,] does not become testimonial simply because the legislature chooses to compel it upon pain of imprisonment."); Svedlund v. Municipality of Anchorage, 671 P.2d 378, 381 (Alaska Ct. App. 1983) (holding that the request to submit to a breathalyzer test was not "interrogation" for purposes of Miranda); State v. Busciglio, 976 So.2d 15, 18-22 (Fla. Dist. Ct. App. 2008) (concluding that asking OVUII suspect whether he was willing to take a breath test did constitute "interrogation" and that suspect's response was not "testimonial"); State v. Cramblet, No. A-01-895, 2002 WL 976035, *5 (Neb. Ct. App. May 14, 2002) (holding that refusals to submit to testing obtained in the implied consent context are not testimonial or communicative and do not implicate the protections of Miranda).

E.

We join these other courts that have considered arguments similar to that raised by Won in the context of implied consent statutes with criminal refusal provisions similar to Hawaiʻi's and conclude that the police were not required to give Miranda warnings to Won before determining whether he would submit to testing. Considering the totality of the circumstances, we hold that the officer's reading of the Implied Consent Form to Won did not constitute interrogation, and that Won's response to the officer's actions by indicating his agreement to submit to breath testing was not a testimonial communication. We therefore conclude that Won's Miranda rights were not implicated or violated by the police action in obtaining his agreement to submit to a breath test.

In analyzing Won's Miranda claim, we note the rather unique circumstances that surround the actions of the police in determining whether an OVUII arrestee will submit to testing. Not only are the police required by statute in every OVUII arrest to determine whether the OVUII arrestee will submit to testing, but the police must also comply with specific requirements set forth in the statute in obtaining the arrestee's decision. In

23

particular, a police officer must inform the arrestee that he or she may refuse to submit to testing, and if the suspect refuses, the officer must also inform the arrestee of the sanctions for refusal. See HRS §§ 291E-11, -15. The record reflects that the police have opted to fulfill their statutory obligations by utilizing pre-printed forms which inform OVUII arrestees that under the implied consent statute, they are deemed to have consented to chemical sobriety testing; that they are not entitled to an attorney before submitting to testing; and that they may refuse to submit to testing, but that if they refuse, they are subject to sanctions, including up to thirty days of imprisonment.

In sum, the actions and discretion of the police in determining whether an OVUII arrestee will submit to testing are limited and constrained by statute. The standardized procedures employed by the police, which not only informs the OVUII arrestee that the police inquiry is pursuant to statute but of the arrestee's right to refuse and the consequences of refusal, serve to diminish any coercion associated with the inquiry and eliminate concerns over an arrestee's will being overborne by the type of coercive police tactics which prompted the Miranda requirements. See Innis, 446 U.S. at 299; Miranda, 384 U.S. at 467. In addition, given the obligation of the police under the statute to determine whether an OVUII arrestee will submit to testing, the police are not seeking a response from the arrestee for its testimonial or communicative content or to incriminate . the arrestee for refusing, but to comply with the statute. The statute is designed to induce an arrestee to submit to testing, not to refuse testing. In any event, the police inquiry does not seek testimonial evidence because it is the act or conduct of refusing, not the means by which the refusal is communicated, that violates the criminal refusal statute.

Under Ketchum, in determining whether "interrogation" for Miranda purposes has occurred, we must consider the totality of the circumstances and "focus upon the officer's conduct, the

24

nature of the question (including whether the question is a 'routine booking question'), and any other relevant circumstance." Ketchum, 97 Hawai'i at 121, 34 P.3d at 1020. With respect to the officer's conduct, the record reflects that to determine whether Won would submit to testing, the officer followed the routine practice of reading the Implied Consent Form to Won, which advised Won of his rights and obligations under the implied consent law, in order to obtain Won's response. There is no suggestion that the officer used any coercive tactics in presenting the Implied Consent Form to Won.

With respect to the nature of the question, including whether it was a routine booking question, the police inquiry into whether Won would submit to testing was required and controlled by statute. The inquiry is "highly regulated by state law" and is presented in a standardized form to OVUII arrestees, characteristics which prompted the United States Supreme Court to conclude that such inquiry did not constitute interrogation within the meaning of Miranda. Neville, 459 U.S. at 564 n.15. Moreover, the inquiry made by the police was not to secure testimonial communications or incriminating evidence, but was based on the statutory obligation imposed on the police to determine whether Won would submit to testing. See Morale, 811 A.2d at 189 (concluding that "[i]t would be anomalous . . . to suppress evidence gathered by asking the statutorily required question" regarding whether an OVUII suspect would submit to testing).

Given the implied consent statutory scheme, Won's response to the inquiry was not sought for its testimonial content and was not testimonial in nature, but represented a nontestimonial act and nontestimonial conduct which the police by statute were required to determine. See Ketchum, 97 Hawai'i at 130, 34 P.3d at 1029 (stating that an "incriminating response" by a suspect "must be testimonial in nature" to be protected by Miranda) (Acoba, J., concurring and dissenting); Cramblet, 2002 WL 976035 at *5-6 (concluding that the defendant's statements

25

were not the product of interrogation because the question regarding testing was not intended to elicit verbal information from the defendant about a crime, but was asked because the statute required the defendant to be asked to submit to a chemical test).  In addition, given the significant sanctions for refusal, the statute is designed to induce an OVUII arrestee to agree to testing, not to refuse.  See Deering, 839 F.2d at 543.

The police inquiry is similar to a routine booking question in that the statute requires that inquiry into whether an OVUII arestee will submit to testing must be made in every OVUII arrest.  Thus, it is an inquiry routinely made in every OVUII arrest, and the inquiry and its content are not based on police discretion, but are required by statute.

Finally, other relevant circumstances support the conclusion that police action in presenting the Implied Consent Form to Won did not constitute interrogation.  Under the implied consent statutory scheme, by operation of law, a person who operates a vehicle upon a public road is deemed to have consented to submit to chemical sobriety tests if arrested for OVUII.  See HRS § 291E-11; Severino, 56 Haw. at 381, 537 P.2d at 1189.  Thus, a person arrested for OVUII does not have an unfettered right to refuse to submit to testing.  However, to avoid potential violence that would attend physically forcing a recalcitrant OVUII arrestee to submit to testing, the statute gives an arrestee the limited option of declining to submit to testing, but subjects the arrestee to sanctions, including criminal sanctions, for making that choice.  Because the OVUII arrestee does not have the unfettered right to refuse to submit to testing under the statutory scheme, it would be misleading to advise the OVUII arrestee that he or she had the right to remain silent or to consult with counsel when asked whether he or she would submit to testing.  See Severino, 56 Haw. at 381-82, 537 P.2d at 1189-90.  This is because an arrestee's refusal to respond to an inquiry regarding testing, or delay in responding to obtain counsel that effectively prevented a test from being

26

administered, would expose the arrestee to sanctions, including criminal penalties, for refusing to submit to testing.

For these reasons, considering the totality of the circumstances, we conclude that the officer's reading the Implied Consent Form to Won to determine whether Won would submit to testing did not constitute "interrogation" within the meaning of Miranda. Accordingly, the officer was not required to advise Won of his Miranda rights before presenting the Implied Consent Form to Won and obtaining Won's response.

II.

A.

Won argues that his breath test results should have been suppressed because the police violated his statutory right to an attorney under HRS § 803-9. That statute provides in relevant part:

> It shall be unlawful in any case of arrest for examination:
>
> (1) To deny to the person so arrested the right of seeing, at reasonable intervals and for a reasonable time at the place of the person's detention, counsel or a member of the arrested person's family;
>
> . . .
>
> (4) In case the person arrested has requested that the person see an attorney or member of the person's family, to examine the person before the person has had a fair opportunity to see and consult with the attorney or member of the person's family[.]

HRS § 803-9.

We conclude that Won's argument is without merit. Won's argument is foreclosed by the Hawai'i Supreme Court's decision in Severino. HRS § 803-9 was in effect when Severino was decided. The court in Severino specifically held that "a motorist is not entitled to consult with counsel before deciding to submit to the chemical test prescribed by the implied consent statute." Severino, .56 Haw. at 380-81, 537 P.2d at 1189. Indeed, the court reversed Severino's license revocation, which was based on his refusal to submit to testing, because Severino

27

was misled into believing that he had a right to refuse testing until he had consulted with his counsel. Id. at 382, 537 P.2d at 1190.

Even assuming *arguendo* that before deciding whether to submit to testing, Won had a statutory right to counsel under HRS § 803-9 that was violated, Won was not entitled to suppression of the results of his breath test. "Generally, where evidence has been obtained in violation of a statute, that evidence is not inadmissible per se in a criminal proceeding unless the statutory violation has constitutional dimensions[,]" or the defendant can demonstrate, by a preponderance of the evidence, a connection between the statutory violation and the evidence to be suppressed. State v. Edwards, 96 Hawai'i 224, 237-39, 30 P.3d 238, 251-53 (2001) (internal quotation marks and citation omitted). As shown by our analysis of Won's Miranda claim, the statutory violation alleged by Won does not have constitutional dimensions.

In addition, Won has not shown by a preponderance of the evidence that the failure to permit him to consult with counsel led to his agreement to submit to the breath testing. As noted, the implied consent statute encourages such agreement by imposing significant sanctions, including criminal penalties, for refusal. Under Hawai'i Rules of Professional Conduct Rule 1.2(d) (2014), "[a] lawyer shall not counsel a client to engage, or assist a client, in conduct that the lawyer knows is criminal . . . ." Since refusing to submit to testing is a crime, Won's counsel could not have directly advised Won to refuse to submit to testing. Moreover, Won does not provide any basis for believing that he would have refused to submit to a breath test if he had consulted with counsel. Therefore, Won has not shown, by a preponderance of the evidence, a connection between the alleged violation of HRS § 803-9 and the results of his breath test, and suppression of the breath test results based on the alleged statutory violation is not warranted. See Edwards, 96 Hawai'i at 237-39, 30 P.3d at 251-53.

B.

The Implied Consent Form informed Won that "You are not entitled to an attorney before you submit to any test or tests to determine your alcohol and/or drug content." Relying on State v. Wilson, 92 Hawaiʻi 45, 987 P.2d 268 (1999), Won alternatively argues that his agreement to submit to testing was not knowing and intelligent because he was misinformed of his right to an attorney under HRS § 803-9. Won contends that his breath test results should be suppressed on this basis. We disagree.

In Wilson, the Hawaiʻi Supreme Court construed the 1997 version of the Hawaiʻi implied consent statute. The court stated that "as the statutory language makes clear, a driver's 'implied consent' to an evidentiary chemical alcohol test is qualified by his or her implied right to refuse such a test after being accurately informed of his or her statutory right to consent or refuse, as well as the consequences of such consent or refusal." Id. at 49, 987 P.2d at 272. It concluded that "Hawaiʻi's implied consent scheme mandates accurate warnings to enable the driver to knowingly and intelligently consent to or refuse a chemical alcohol test." Id. Because the arresting officer had misstated the applicable sanctions for refusing to submit to testing, the court held that Wilson's decision to submit to testing was not knowing and intelligent, and it suppressed the results of his breath test. Id. at 51-54, 987 P.2d at 274-77.

We conclude that Won's reliance on Wilson is misplaced. Wilson held that for an OVUII arrestee's decision on testing to be valid, the police must accurately inform the arrestee of his or her rights under the implied consent statute to consent to or refuse testing and the applicable consequences of the arrestee's decision. Id. at 49, 987 P.2d at 272. Won's right to counsel under HRS § 803-9 is not part of his rights to consent to or refuse testing under the implied consent statute or part of the statutory consequences of his decision on testing. Wilson does not require that an OVUII arrestee be advised of statutory rights not contained in the implied consent statute, and HRS § 803-9

29

FOR PUBLICATION IN WEST'S HAWAI'I REPORTS AND PACIFIC REPORTER

itself does not require an advisement of rights. Therefore, Won
is not entitled to suppress his breath test results based on
Wilson.

III.

Won argues that his breath test results should have
been suppressed because the Implied Consent Form misinformed him
of the sanctions for refusing to submit to testing. The portion
of the form Won claims was inaccurate states: "if you refuse to
submit to a breath, blood, or urine test, you shall be subject to
up to thirty days imprisonment and/or fine up to $1,000 or the
sanctions of 291E-65, if applicable." (Emphasis added.) Won
contends that the form should have instead stated that if testing
is refused, "you may be subject to up to thirty days imprisonment
if convicted." Based on Wilson, Won argues that because he was
misinformed of the sanctions for refusal, his agreement to submit
to testing was invalid and his breath test results must be
suppressed. We disagree.

In Wilson, under the then-existing implied consent
sanctions, Wilson was subject to the revocation of his driving
privileges for three months to a year if he agreed to and failed
a blood-alcohol test. Wilson, 92 Hawai'i at 51, 987 P.2d at 274.
Instead, the implied consent form read to Wilson by the arresting
officer stated only that a "three month revocation would apply if
you chose to take the test and failed it." Id. (internal
quotation marks and ellipsis points omitted). The court
concluded that this advisement "was inaccurate and misleading"
because it did not "fully inform Wilson of the legal consequences
of submitting to a blood test[,]" and that the misleading
information was relevant to his decision on whether to agree to
or refuse the test. Id. The court therefore held that Wilson
was prevented from making a "knowing and intelligent" decision on
whether to take the test, and it affirmed the suppression of
Wilson's test results based on the failure of the police to
fulfill their statutory duty to inform Wilson of his implied

30

right to consent to or refuse testing, and the consequences of that decision.  Id. at 51-54, 987 P.2d 268 at 274-77.

We conclude that, unlike in Wilson, the Implied Consent Form presented to Won was not inaccurate or misleading.  As stated in the form, if Won failed to submit to testing, he *was* subject to up to thirty days imprisonment.  The use of the term "up to" also conveyed the contingent nature of the sanctions and that the reference to "thirty days imprisonment" was the maximum possible punishment.  Moreover, it is common knowledge that imprisonment is a criminal punishment that is triggered by a conviction.  We conclude that Won was sufficiently advised of the potential criminal sanctions for refusing to submit to testing and that his decision to submit to a breath test was knowing and intelligent.

IV.

Won claims that in light of the United States Supreme Court's recent decision in McNeely, HRS § 291E-68 violates the Fourth Amendment to the United State Constitution and Article I, Section 7 of the Hawai'i Constitution.[20]  Specifically, Won contends that McNeely establishes that he had a constitutional right to withdraw his consent to be tested for breath alcohol

_____

[20] The Fourth Amendment to the United States Constitution states:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

Article I, Section 7 of the Hawai'i Constitution states:

The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches, seizures and invasions of privacy shall not be violated; and no warrants shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized or the communications sought to be intercepted.

Haw. Const. art I, § 7.

concentration, and that HRS § 291E-68 impermissibly infringes on that right. In addition, Won argues that because HRS § 291E-68 is unconstitutional, the Implied Consent Form misinformed him of the sanctions for refusing to submit to testing because it included the sanctions imposed by HRS § 291E-68. Finally, Won appears to argue that his breath test violated his rights under the Fourth Amendment and Article I, Section 7 because it was conducted without a search warrant. As explained below, we disagree with Won's arguments.

A.

Won argues that the Supreme Court's recent decision in McNeely renders HRS § 291E-68 unconstitutional. It is well settled that a party challenging the constitutionality of a statute faces a heavy burden. The Hawai'i Supreme Court has long held that: "(1) legislative enactments are presumptively constitutional; (2) a party challenging a statutory scheme has the burden of showing unconstitutionality beyond a reasonable doubt; and (3) the constitutional defect must be clear, manifest, and unmistakable." Pray v. Judicial Selection Comm'n, 75 Haw. 333, 340, 861 P.2d 723, 727 (1993) (internal quotation marks, brackets, and citation omitted).

In Schmerber, the United States Supreme Court upheld a warrantless blood draw to conduct a blood-alcohol test from a non-consenting person arrested for OVUII, because the officer "might reasonably have believed that he was confronted with an emergency, in which the delay necessary to obtain a warrant, under the circumstances, threatened the destruction of evidence[.]" Schmerber, 384 U.S. at 770 (internal quotation marks and citation omitted). In McNeely, the Court considered "whether the natural metabolization of alcohol in the bloodstream presents a per se exigency that justifies an exception to the Fourth Amendment's warrant requirement for nonconsensual blood testing in all drunk-driving cases." McNeely, 133 S. Ct at 1556. The Court held that the answer to this question was no. Id. The

Court declined to adopt a categorical rule that exigent circumstances always exist to permit nonconsensual blood draws for alcohol testing without a warrant where there is probable cause for an OVUII arrest, and instead opted for a case-by-case assessment of exigency.  Id. at 1561.

In support of its decision, the Court noted the intrusive nature of the blood-withdrawal search at issue in the case.  The Court described the search as "involv[ing] a compelled physical intrusion beneath McNeely's skin and into his veins to obtain a sample of his blood[,]" and it stated that "[s]uch an invasion of bodily integrity implicates an individual's 'most personal and deep-rooted expectations of privacy.'"  Id. at 1558 (citation omitted).

In response to the arguments of Missouri and its amici that the absence of a per se exigency rule for blood draws would "undermine the governmental interest in preventing and prosecuting drunk-driving offenses," Justice Sotomayor stated:

> States have a broad range of legal tools to enforce their drunk-driving laws and to secure BAC [(blood alcohol concentration)] evidence without undertaking warrantless nonconsensual blood draws.  For example, all 50 States have adopted implied consent laws that require motorists, as a condition of operating a motor vehicle within the State, to consent to BAC testing if they are arrested or otherwise detained on suspicion of a drunk-driving offense.  Such laws impose significant consequences when a motorist withdraws consent; typically the motorist's driver's license is immediately suspended or revoked, and most States allow the motorist's refusal to take a BAC test to be used as evidence against him in a subsequent criminal prosecution.

Id. at 1566 (internal citations omitted) (emphasis added) (plurality opinion).[21]

### B.

McNeely addressed the narrow question of whether the dissipation of alcohol in the bloodstream establishes a per se exigent-circumstances exception to the warrant requirement for nonconsensual blood draws for OVUII arrests.  McNeely did not

---

[21] Justice Kennedy, who was part of the Court's five-member majority, did not join in the quoted portion of Justice Sotomayor's opinion.

address other potential exceptions to the warrant requirement, the Fourth Amendment implications of breath tests, the validity of implied consent statutes, or the validity of breath tests conducted pursuant to such statutes.

Here, Won agreed to submit to a breath test pursuant to Hawai'i's implied consent statute. Unlike McNeely, Won was not subjected to a compelled nonconsensual blood draw. A breath test is "less intrusive" than a blood test. Skinner v. Railway Labor Executives' Ass'n, 489 U.S. 602, 625 (1989). "Unlike blood tests, breath tests do not require piercing the skin and may be conducted safely outside a hospital environment and with a minimum of inconvenience or embarrassment. Further, breath tests reveal the level of alcohol in the employee's bloodstream and nothing more." Id.

A Hawai'i driver, like Won, who is arrested for OVUII based on alcohol consumption has the option of electing to take a breath test, a blood test, or both. HRS § 291E-11(c). Because a Hawai'i driver can chose to take the less intrusive breath test, and because in this case Won chose to take a breath test, we only address the constitutionality of HRS § 291E-68 as it applies to breath tests under the implied consent statutory scheme in a typical OVUII case.[22] We conclude that Won has failed to meet his heavy burden of showing that McNeely renders HRS § 291E-68 unconstitutional. See Pray, 75 Haw. at 340, 861 P.2d at 727.

C.

"As the text of the Fourth Amendment indicates, the ultimate measure of the constitutionality of a governmental search is 'reasonableness.'" Maryland v. King, 133 S. Ct. 1958, 1969 (2013) (internal quotation marks and citation omitted). The proper function of the Fourth Amendment is not to constrain all bodily intrusions, but only intrusions which are unjustified and made in an improper manner. Id. The United States Supreme Court has stated:

---

[22] See footnote 12, supra.

> [W]hen faced with special law enforcement needs, diminished expectations of privacy, minimal intrusions, or the like, the Court has found that certain general, or individual, circumstances may render a warrantless search or seizure reasonable. Those circumstances diminish the need for a warrant, either because 'the public interest is such that neither a warrant nor probable cause is required,' or because an individual is already on notice, for instance because of his employment, or the conditions of his release from government custody, that some reasonable police intrusion on his privacy is to be expected.

Id. (internal quotation marks and citations omitted).

In determining whether a warantless search or seizure is reasonable, the court must balance the government's need to search against the intrusion on the individual's privacy interests. See In re Doe, 77 Hawai'i 435, 439, 887 P.2d 645, 649 (1994) (stating that the reasonableness of a class of searches requires balancing the need to search against the invasion which the search entails); United States v. Place, 462 U.S. 696, 703 (1983) ("We must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion."); Terry v. Ohio, 392 U.S. 1, 20-21 (1968). In evaluating the individual's interests regarding bodily searches, courts consider the degree to which the search invades an individual's legitimate expectations of privacy and the magnitude of the intrusion, including the extent to which the procedure may threaten the person's safety or health. King, 133 S. Ct. at 1978-79 (citing the diminished expectation of privacy of an individual taken into police custody and the minimal bodily intrusion resulting from taking a buccal swab from inside the mouth in upholding the constitutionality of a statute authorizing a warrantless search using a buccal swab to obtain a sample of a person's DNA after certain arrests).

D.

As noted, McNeely only addressed the exigent-circumstances exception to the warrant requirement for nonconsensual blood draws; it did not address breath tests or other exceptions to the warrant requirement.

Consent to search is an exception to the warrant requirement under the Fourth Amendment and Article I, Section 7. See State v. Hanson, 97 Hawai'i 71, 76, 34 P.3d 1, 6 (2001). Warrantless searches have also been found reasonable in other circumstances involving "special law enforcement needs, diminished expectations of privacy, minimal intrusions, or the like," where the need for a warrant is diminished because of the public interest or because "an individual is already on notice . . . that some reasonable police intrusion on his privacy is to be expected." King, 133 S. Ct. at 1969.

In addition, "[d]riving is a privilege, not a right." State v. Spillner, 116 Hawai'i 351, 364, 173 P.3d 498, 511 (2007). Pursuant to Hawai'i's implied consent statute, the Legislature has imposed conditions on its grant of the privilege to drive on public roads. As a matter of law, a person who exercises the privilege to drive and operates a vehicle on a public road is deemed to have given his or her consent to submit to testing of the person's breath, blood, or urine for alcohol or drugs, as prescribed by the implied consent statute. See HRS § 291E-11; Severino, 56 Haw. at 381, 537 P.2d at 1189; Rossell, 59 Haw. at 182, 579 P.2d at 669. Thus, under Hawai'i's implied consent statute, by driving on a public road, the driver has consented to testing.

The Legislature presumably could have sought to make the implied consent to breath testing completely irrevocable. See Rowley, 629 S.E.2d at 191 ("The act of driving constitutes an irrevocable, albeit implied, consent to the officer's demand for a breath sample."); State v. Diaz, 160 P.3d 739, 741-42 (2007) (applying statutory implied consent despite driver's attempt to withdraw consent). However, to avoid physical violence, Hawai'i's implied consent statute gives a driver the limited right, subject to the imposition of significant sanctions, to refuse to submit to testing. But this limited statutory right to refuse testing only modifies, but does not vitiate, the driver's implied consent to testing. The limited statutory right to

36

refuse testing also does not mean that the driver's implied consent is not valid for purposes of the Fourth Amendment and Article I, Section 7.  See Rowley, 629 S.E.2d at 191 (holding that a driver's implied consent to submit to breath samples by exercising the privilege of driving was a valid consent to search under the Fourth Amendment); Burnett v. Municipality of Anchorage, 634 F. Supp. 1029, 1038 (D. Alaska 1986) (noting that a driver, who has given his or her implied consent to a breath test by driving on a public highway, is not entitled to recant or withdraw such consent for Fourth Amendment purposes after being lawfully arrested for OVUII).[23]

In effect, by exercising the privilege of driving, a driver (like Won) consents to submit to a breath test, pursuant to a statutory scheme that protects the driver from being physically forced to undergo testing, but imposes sanctions on the driver's exercise of that option.  In balancing the government's interest against the individual's privacy interest, we conclude that obtaining a driver's breath test under the procedures set forth in the implied consent statute is reasonable and does not violate the Fourth Amendment and Article I, Section 7.

The governmental interest in protecting lives, securing the safety of our public roads, and deterring drivers from operating vehicles while intoxicated is strong and compelling.[24]

---

[23] In this regard, the implied consent statute has two components, both of which are reasonable.  It is reasonable for the Legislature to condition its grant of the privilege of driving on a person's agreement to submit to breath testing if arrested for OVUII.  It is also reasonable for the Legislature to enforce that bargain by imposing penalties on a driver who refuses to honor his or her agreement.

[24] Although the dissipation of alcohol in the bloodstream does not establish a *per se* exigent-circumstances exception to the warrant requirement for nonconsensual blood draws, McNeely, 133 S. Ct at 1556, 1563, it does impose time constraints on the government with respect to obtaining the results of a breath test.

On the other hand, the intrusion on personal privacy effected by a breath-test search under the statutory scheme is quite limited. Only a driver arrested on probable cause of OVUII, who already has a diminished expectation of privacy because he or she is in custody, see King, 133 S. Ct. at 1978, is subject to a breath test. Such a driver's objective expectation of privacy is further diminished by the implied consent to breath testing imposed by statute, which gives a driver statutory notice that if arrested for OVUII, "some reasonable police intrusion on his [or her] privacy is to be expected." Id. at 1969. The breath test itself is minimally intrusive. See Skinner, 489 U.S. at 625. Unlike more intrusive blood tests, breath tests do not require piercing the skin, are safely conducted outside the hospital environment, and involve a minimum of inconvenience or embarrassment. Id. They only reveal very limited and targeted information -- the level of alcohol in a driver's system. Id. Moreover, the breath tests are based on the driver's implied consent to testing that is given in exchange for the privilege of driving and administered under a statutory scheme which protects a driver from being physically forced to submit to the test. See HRS §§ 291E-11, 291E-15.

In Hanson, the Hawai'i Supreme Court held that an airline passenger, who impliedly consented to the search of a toolbox by submitting it for inspection, could not withdraw his consent to search a plastic bag wrapped in duct tape found in the toolbox. Hanson, 97 Hawai'i at 75-77, 34 P.3d at 5-7.[25] The court reasoned that because the purpose of a security inspection can only be effectuated if the contents of items submitted for

_____

[25] In Hanson, an airline passenger submitted a toolbox for inspection, but refused to consent to a security officer's request to search a plastic bag wrapped in duct tape found in the toolbox. Hanson, 97 Hawai'i at 72, 34 P.3d at 2. The security officer opened the plastic bag and found a handgun, which led to Hanson's prosecution for a firearms offense. Id.

inspection can be discerned, the scope of the passenger's implied consent to search in submitting the toolbox for inspection extended to its contents, notwithstanding the passenger's refusal to consent to a search of the wrapped plastic bag. Id. at 76-77, 34 P.3d at 6-7. Accordingly, the court held that the warrantless search of the wrapped plastic bag did not violate the Fourth Amendment or Article I, Section 7. Id.

By similar reasoning, the purpose of the implied consent statute would be defeated if a driver could freely withdraw his or her consent to submit to a breath test after being arrested for OVUII. We conclude that the statutory scheme, which imposes sanctions to dissuade a driver from withdrawing his or her content, is reasonable and does not violate the Fourth Amendment or Article I, Section 7.[26]

McNeely does not address breath tests or the validity of implied consent statutes, and neither McNeely's holding nor its reasoning compels the conclusion that HRS § 291E-68 is unconstitutional.[27] Indeed, Justice Sotomayor and three other justices appear to endorse implied consent statutes, and their use of "significant consequences" to discourage a driver from refusing to submit to testing, as a preferred alternative to "nonconsensual blood draws." See McNeely, 133 S. Ct at 1566 (plurality opinion). McNeely also emphasized the intrusive

---

[26] We note that courts from other jurisdictions have also held that a warrantless breath test obtained from an OVUII arrestee is a valid search incident to arrest. See United States v. Reid, 929 F.2d 990, 994 (4th Cir. 1991); Burnett v. Municipality of Anchorage, 634 F.Supp. 1029, 1037 (D. Alaska 1986), aff'd 806 F.2d 1447, 1449-50 (9th Cir. 1986); Svedlund, 671 P.2d at 384.

[27] Although Won challenges the constitutionality of HRS § 291E-68, he notes that HRS § 291E-15 only requires the police to advise an OVUII arrestee of the sanctions for refusing testing after an initial refusal, and he states that his agreement to a breath test would have been valid if it came in response to an initial inquiry that did not mention the sanctions for refusal. In light of our analysis, we need not distinguish between an initial inquiry regarding testing and an inquiry following an initial refusal under HRS § 291E-15 in evaluating the constitutionality of HRS § 291E-68.

nature of a blood draw and did not analyze the constitutional implications of a breath test, which is at issue in Won's case. See id. at 1558. Under these circumstances, we reject Won's claim that McNeely renders HRS § 291E-68 unconstitutional.[28]

E.

Because Won has failed to show that HRS § 291E-68 is unconstitutional, we reject his claim that the Implied Consent Form misinformed him of the sanctions for refusing to submit to testing because it included the sanctions imposed by HRS § 291E-68. We also reject Won's claim that his breath test violated the Fourth Amendment and Article I, Section 7 because it was conducted without a search warrant. Based on our previous analysis, we conclude that Won's breath test was properly obtained pursuant to the implied consent statute and that his rights under the Fourth Amendment and Article I, Section 7 were not violated. Under the circumstances presented, the police were not required to obtain a search warrant before conducting Won's breath test.

---

[28] We note that on February 3, 2014, Won submitted a citation of a supplemental authority pursuant to Hawai'i Rules of Appellate Procedure Rule 28(j) (2010). Won cited an unpublished decision of the United States Supreme Court in Aviles v. Texas, 134 S. Ct. 902, 2014 WL 102362 (2014) (mem.), in which the Court summarily granted the writ of certiorari, vacated the judgment, and remanded the case to the Court of Appeals of Texas "for further consideration in light of [McNeely]." In the underlying case, the Texas Court of Appeals upheld the admission of a warrantless blood draw, taken by the police over the defendant's objection, pursuant to Texas's implied consent statute which authorized such action. Aviles v. State, 385 S.W.3d 110, 115-16 (Tex. App. 2012). Won reads the Supreme Court's action in Aviles as indicating that there is no "implied consent" exception to the warrant requirement. However, absent a more definitive statement by the United States Supreme Court, we decline to read the Court's action in Aviles as a decision addressing the merits of implied consent statutes or the issues presented in Won's case.

CONCLUSION

For the foregoing reasons, we affirm Won's conviction and sentence.[29]

Jonathan Burge
for Defendant-Appellant

Brian R. Vincent
Deputy Prosecuting Attorney
City and County of Honolulu
for Plaintiff-Appellee

Robert T. Nakatsuji
Deputy Solicitor General
Department of the Attorney General
for Amicus Curiae

[29] As noted in footnote 7, <u>supra</u>, the Judgment erroneously indicates that Won was convicted of violating both HRS 291E-61(a)(1) and (a)(3). We direct the District Court to file a corrected judgment to reflect that Won was only convicted of violating HRS § 291E-61(a)(3), as first offender under HRS § 291E-61(b)(1).